381 A.2d 990

Andrew V. CAROLLO and James Roy DeRocco

v.

FORTY–EIGHT INSULATION, INC., a corporation, Vimasco Corp., a corporation, Gustin-Bacon, Division of Certain Teed Products Corp., Eagle-Picher Industries, Inc., a corp., Pittsburgh Corning Corporation, Owens-Corning Fiberglass Corp., Johns-Manville Products Corporation and Benjamin Foster, a Division of Amchem Products, Inc.

v.

WHEELING PITTSBURGH STEEL CORPORATION, United Steelworkers of America, Local 1229, and the United Steelworkers of America International and George V. Hamilton, Inc.

v.

UNARCO INDUSTRIES, INC., the Philip Carey Manufacturing Company, a/k/a Philip Carey Corporation, and Briggs Manufacturing Company, a/k/a Panacon Corporation and the Celotex Corporation.

Superior Court of Pennsylvania.

Argued Nov. 9, 1976.

Decided Dec. 28, 1977.

424

Patrick R. Riley, Greensburg, for appellant at No. 667.

Randall J. McConnell, Jr., Pittsburgh, with him James R. Miller, Pittsburgh, for appellant at No. 682.

John David Rhodes, Pittsburgh, with him James R. Hartline, Pittsburgh, for appellant at No. 684.

Charles J. Duffy, Jr., Alfred E. Lawson, Joseph B. Bagley, R. Kenneth Willman, Chester S. Fossee, and James F. Manley, Pittsburgh, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT, and SPAETH, JJ.

SPAETH, Judge:

This is an appeal from an order entering summary judgment.

Plaintiffs worked many years for Wheeling-Pittsburgh Steel Corporation, installing insulation in Wheeling-Pittsburgh's Monessen plant. They allege in their complaint that during the course of their employment they contracted asbestosis and pneumoconiosis as a result of prolonged inhalation of asbestos fibers. Defendants are manufacturers of insulation products of which asbestos is allegedly a component; among them are Benjamin Foster, a Division of Amchem Products, Inc., Gustin-Bacon, Division of Certain Teed Products Corp., and Vimasco Corporation. There are also additional defendants; these are still other manufacturers of insulation, and also Wheeling-Pittsburgh and the local and international unions that were plaintiffs' bargaining agents, United Steel Workers of America, Local 1229, and United Steel Workers of America International.

Benjamin Foster, Gustin-Bacon, Vimasco, and the unions moved for summary judgment in accordance with Pa.R.Civ.P. 1035. The motions were filed just before the date set for trial, and were denied on the ground that consideration of them would have delayed the trial. However, when one of the plaintiffs was hospitalized the trial

was delayed anyway, so the lower court considered the motions on the merits, and granted them. These appeals are by two of defendants, Owens-Corning Fiberglass Corporation and Pittsburgh Corning Corporation, and one of additional defendants, Unarco Industries, Inc.[1]

The principles that govern such cases as this are settled.

One who moves for a summary judgment has the burden of showing that there is no genuine issue as to any material fact. *Schacter v. Albert,* 212 Pa.Super. 58, 239 A.2d 841 (1968). To do this, the moving party must submit affidavits or other evidence in support of the motion. *Marchese v. Marchese,* 457 Pa. 625, 326 A.2d 321 (1974). The court hearing the motion should accept as true all well-pleaded facts and any admissions on file, but should resolve any doubts as to the existence of a genuine issue of a material fact against the moving party. *Schacter v. Albert, supra.* On appeal, this court must examine the record in the light most favorable to the appellant. *Speyer, Inc. v. Goodyear Tire & Rubber Co.,* 222 Pa.Super. 261, 295 A.2d 143 (1972).

With these principles in mind, we may examine the several motions for summary judgment.

—Benjamin Foster's Motion—

In answer to interrogatories, plaintiffs specified that the insulation product used by them at Wheeling-Pittsburgh was "insulkote." In its affidavit in support of its motion for summary judgment, Benjamin Foster said it did not manufacture a product called "insulkote," but that defendant Johns-Manville Products Corporation did. Benjamin Foster admitted manufacturing, and selling to Wheeling-Pittsburgh, a pre-mixed product similar to insulkote, but it said that no asbestos fibers could escape into the air from its product, so plaintiffs could not have suffered harm from

1. A defendant or additional defendant has standing to appeal an order letting a co-defendant or co-additional defendant out of a case. *East Broad Top Transit Co. v. Flood,* 326 Pa. 353, 192 A. 401 (1937); *Schwartz v. Jaffe,* 324 Pa. 324, 188 A. 295 (1936).

inhaling it. Benjamin Foster said it sold no other product to Wheeling-Pittsburgh.

An examination of plaintiffs' depositions supports Benjamin Foster on these points. In considering these depositions we assume that when plaintiffs specified "insulkote", we are to read that to mean, "whatever pre-mixed product Benjamin Foster manufactured."

There is no evidence that Benjamin Foster sold Wheeling-Pittsburgh any product other than the pre-mixed product. DeRocco at 74, 109. The pre-mixed product was described as "a black substance like a tar," Carollo at 59; it came in 10 or 5-gallon cans, DeRocco at 74.

Plaintiff DeRocco testified as follows:

Q. Did you ever receive or utilize an insulating material that was delivered in a liquid form that was applied by a trowel or with a plastering-type of product; in other words, pre-mixed?

A. Yes.

Q. Who did you receive that from?

A. Insulcote.

Q. Insulcote?

A. C-o-t-e. I think the other was Scott's, S-c-o-t-t-'s. That's all I can recollect now.

Q. From this pre-mixed covering, you did not get any dust from that, did you, when you were using it, since it was already in a liquid state?

A. No, no dust. Odor, possibly, yes.

DeRocco at 72–73.

He also testified as follows, when counsel for Vimasco was questioning him about the various manufacturers and which of their products Wheeling-Pittsburgh used:

Q. And Benjamin Foster?

A. That's the prepared mixture of tar, or sort of a roofing cement, whatever you want to call it.

Q. This was already pre-mixed?

A. Pre-mixed.

Q. How would you get any dust or anything in your lungs from using premixed product.

A. I don't know about dust, I'm not—we had to open it and mix it ourselves after it was an accumulation.

Q. Like a paint can?

A. Yes, you shake it up or mix it up, and it had a tough odor to it.

Q. It only had an odor, no flakes coming out of it?

A. I guess so.

DeRocco at 87.

There is no evidence to contest Benjamin Foster's affidavit that the combination of asbestos fiber with liquid resins and solvents prevented any asbestos fibers from escaping into the air.

The lower court therefore properly granted summary judgment in favor of Benjamin Foster.

### —Gustin-Bacon's Motion—

██ In its affidavit in support of its motion for summary judgment, Gustin-Bacon denied that any Gustin-Bacon product used at the Wheeling-Pittsburgh plant in Monessen contained asbestos; its product that was used there, Gustin-Bacon said, was fiber glass. It admitted that it had manufactured two products, one from 1945 to 1947, and the other from 1945 to 1970, consisting of fiber glass insulation lined with asbestos paper or asbestos-treated cloth. However, it said that these products were promoted and sold solely for use in passenger railroad cars; that they were not suitable for insulating locomotives; and that tank cars during the pertinent period were being insulated with rock wool or cork.

There was ample evidence in plaintiffs' depositions that they used Gustin-Bacon's "snap-on" pipe insulation at the Wheeling-Pittsburgh plant, but they nowhere testified that this product contained asbestos. Thus the Gustin-Bacon affidavit, that the Gustin-Bacon product used at the plant contained only fiber glass, not asbestos, is uncontested.

Also, in answers to interrogatories, plaintiffs specified that they worked on insulating locomotives and tank cars for Wheeling-Pittsburgh; there is no evidence that they ever worked on passenger railroad cars, or that any Gustin-Bacon fiber glass asbestos-lined insulation ever found its way into locomotives or tank cars.[2]

The lower court therefore properly granted summary judgment in favor of Gustin-Bacon.

—Vimasco's Motion—

■ Vimasco contends that the depositions of various persons in record-keeping capacities conclusively showed that no Vimasco product was sold to Wheeling-Pittsburgh during the period of plaintiffs' employment. Furthermore, in its affidavit in support of its motion for summary judgment, it asserts that it sells products containing asbestos only in an incapsulated or liquid state, and that during the manufacture of such products the asbestos fibers are soaked with binder ingredients so that they cannot escape into the air. In granting summary judgment in favor of Vimasco, the lower court said: "Vimasco sold no products to Wheeling-Pittsburgh, plaintiffs' employer," Lower Court Slip Opinion at 3.

Plaintiffs testified, however, to having used Vimasco products:

Q. Is it possible you did not use Vimasco products until the year 1972?

A. Until—no, we used it earlier than that.

Q. When is the earliest you have used it?

A. Earlier than '72?

Q. Earlier than say 1945?

A. I can't pinpoint that. I don't recollect that. I can say I used it before 1972.

Q. Let's go backwards. Did you use it before 1965?

A. Yes.

2. It is too late for plaintiffs to argue at this point that they could have gotten asbestosis or pneumoconiosis from fiber glass particles; there was no evidence to this effect.

Q. Before 1950?

A. Yes.

DeRocco at 76.

Furthermore, there was evidence that the Vimasco products used were not only in an incapsulated or liquid state:

Q. As far as Vimasco is concerned, the product that you utilized by them in addition to the pre-mixed, was it sheets, block, rolls?

A. I would say block and cement. That's all I can remember. That's all I can recollect.

Q. Cement, you mean the kind that came in powdered form that you had to mix?

A. Right.

DeRocco at 76–77.

Plaintiffs further testified that they also used the Vimasco brand of three-foot sections of insulation for wrapping around pipes, DeRocco at 23–24. DeRocco testified as follows:

Q. Was there dust when you used the three feet by one-and-a-half-inch sections?

A. Yes, sir.

Q. Was this also true throughout the period that you worked for Wheeling-Pittsburgh?

A. Yes, sir.

Q. Was there dust from the block, when you would use that?

A. Yes, sir.

Q. Throughout the entire time you used it?

A. Yes, sir.

Q. Was there dust from the asbestos cement?

A. Yes, sir.

DeRocco at 24.

■ Thus there is ample evidence that Vimasco products were used at the Wheeling-Pittsburgh plant; there is also evidence that they spread dust around, asbestos dust in particular, Carollo at 79. This evidence contradicts the

depositions and affidavit cited by Vimasco. Therefore, reading the evidence in the best possible light for appellants, and resolving all conflicts in testimony in their favor, a genuine issue as to a material fact remains.[3] Accordingly, the order granting summary judgment in favor of defendant Vimasco must be reversed.

—The Unions' Motions—

 The general guidelines of federal preemption of state law in the area of labor relations have been set out by the Supreme Court of the United States. "The national Act . . . leaves much to the states, though Congress has refrained from telling us how much. We must spell out from conflicting indications of congressional will the area in which state action is still permissible." *Garner v. Teamsters Union,* 346 U.S. 485, 488, 74 S.Ct. 161, 164, 98 L.Ed. 228 (1953). State action is still permissible when the labor relations in question involve "conduct touch[ing] interests so deeply rooted in local feeling and responsibility that . . . we could not infer that Congress had deprived the States of the power to act." *San Diego Unions v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). Thus, policing of actual or threatened violence to persons or destruction of property has been held a matter for the States. *Lodge 76, Int'l Assoc. of Machinists and Aerospace Workers, AFL–CIO v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). Similarly, the federal law governing labor relations does not withdraw from the states the power to regulate activity merely of peripheral concern to the Labor Management Relations Act. *San Diego Unions v. Garmon, supra.*

3. Pa.R.Civ.P. 1035 requires that a motion for summary judgment be granted in favor of the moving party if the other party fails to file affidavits or other evidence in support of its case, that is, chooses to rest on its pleadings, *unless* a genuine issue of fact is made out in the moving party's evidence taken by itself. *Pape v. Smith,* 227 Pa.Super. 80, 323 A.2d 856 (1974). Plaintiff's depositions, taken at the initiative of the defendants moving for summary judgment, thus make out a genuine issue of fact whether or not they are considered "defendants' evidence."

The question here is whether the imposition on the unions of tort liability under state law would represent permissible state action or an intrusion into the area preempted by federal law.

 Under federal law, unions have a duty fairly to represent all of their members, that is, to "serve the interest of all members without hostility or discrimination toward any, to exercise [their] discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967). The contention here, in Vimasco's complaint against the unions as additional defendants, is that since health and safety are mandatory bargaining issues, a duty arises on the part of the unions to search out hazards (such as the possibility of injury by inhaling asbestos fibers) so that they can be bargained over.[4] This contention, however, mistakes the purpose of Congress in imposing the duty of fair representation. Under federal law, the union becomes the sole bargaining agent for all of the employees. By imposing upon it the duty of fair representation, Congress sought to prevent it from neglecting the wishes of the minority "electorate", *Humphrey v. Moore,* 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Congress did not seek to make the union responsible for its members' working conditions. Thus, in a case similar to the present one, the Sixth Circuit held that failure of a union to enforce the provisions of the Federal Mine Safety Act, which had been incorporated into the contract, was not a violation of the duty of fair representation. The court noted:

> This Court is not unfamiliar with the difficult and long standing problem of insuring safety in the coal mines of this country. We recognize the harsh plight of those who have lost the family breadwinner through the all too

---

4. *See* in particular paragraph 5 of Vimasco's complaint against the unions, alleging (to summarize) that the unions should have warned plaintiffs as union members of the danger of disease or injury arising from the use of or exposure to asbestos or asbestos products, and also, should have required Wheeling-Pittsburgh as plaintiffs' employer to provide plaintiffs "with the proper equipment." R. 33a–35a.

frequent intervention of mining disaster. The answer to their problem is not to pervert the collective bargaining process by reading into its instruments a liability which was never contemplated and duties which were never assumed in fact or in theory. To saddle labor unions with liability for the mine operator's failure to comply with standards introduced into the contract at the union's bidding would simply be to discourage the inclusion of similar or more effective standards in later contracts. Such a result would not serve the interest of miners and would retard rather than advance the goals of the National Labor Policy. *Bryant v. Int'l Union United Mineworkers of America,* 467 F.2d 1, 5 (6th Cir. 1972).

While the court in *Bryant* did not discuss the union's possible common law tort liability, its logic is persuasive on that subject as well. *See also, House v. Mine Safety Appliances Co.,* 92 L.R.R.M. 3688 (D.C.Idaho 1976), for a similar discussion. There the court held that even if a collective bargaining agreement could be read to impose a duty on the union to inspect the mine, liability for injuries did not automatically arise from a breach of the duty of fair representation. Finally, as Professor Archibald Cox has noted:

> If the effectuation of national labor policy requires exclusion of state procedures and remedies for conduct of a kind prohibited by national policy, a fortiori the national policy must require the exclusion of state efforts to impose different substantive restrictions within the area of labor-management relations. The application of different substantive rules through state tribunals would multiply the effects of divergencies in procedure, remedies, and interpretation of federal law. Cox, *Labor Law Preemption Revisited,* 85 Harv.L.Rev. 1337, 1345 (1972).

We therefore conclude that it would represent an intrusion into the area preempted by federal law were we to hold that the unions' duty of fair representation imposed upon them the duty to search out and take precautions against the possibility that plaintiffs as its members might suffer harm by inhaling asbestos fibers while working for Wheel-

ing-Pittsburgh. The lower court therefore properly granted summary judgment in favor of the unions.

The order of the lower court is reversed as to appellee Vimasco Corporation, and otherwise is affirmed.

WATKINS, President Judge, dissents.