459 A.2d 757

**Glenn OLBUM and Carolyn T. Olbum, his wife, Appellants,**

**v.**

**OLD HOME MANOR, INC., a corporation.**

Superior Court of Pennsylvania.

Argued April 26, 1982.

Filed March 25, 1983.

Reargument Denied June 3, 1983.

Lester E. Zittrain, Pittsburgh, for appellants.

Gregg M. Rosen, Pittsburgh, for appellee.

Before BECK, MONTEMURO and POPOVICH, JJ.

MONTEMURO, Judge:

This is an appeal from an order of the Court of Common Pleas of Allegheny County entering judgment in favor of the defendant/appellee, Old Home Manor, Inc. The judgment so entered by the court below was on a Case Stated.

## PROCEDURAL HISTORY

An analysis of the procedural history may be helpful. Appellants herein, Glenn and Carolyn Olbum, filed a complaint in assumpsit seeking sums in the form of minimum

royalties allegedly due them from appellee, under the terms of a written agreement. Subsequent to the close of the pleadings, appellants filed a Motion for Summary Judgment. The motion was submitted to the court below on briefs and affidavits of the parties. Following oral argument the matter was taken under advisement by the trial judge, the Honorable Richard G. Zeleznik.

Thereafter the court entered an order dismissing the Motion for Summary Judgment and accompanied the order with a nine page opinion.

Several months later the parties submitted the controversy to the Honorable Joseph A. Del Sole as a Case Stated, the same being a stipulation of counsel designed to be considered by the court in conjunction with the pleadings, exhibits, affidavits, interrogatories and answers thereto, and requests for admissions and answers thereto. The facts having been agreed to by the stipulation, the parties waived their right to an evidentiary hearing.

Several months thereafter the trial judge entered judgment in favor of the appellee herein, Old Home Manor, Inc., and from that judgment the appellants, Glen and Carolyn T. Olbum, have taken this appeal.

The Honorable Joseph A. Del Sole, filed an opinion wherein he stated that following a review of the entire record and the stipulation, he was adopting the opinion of Judge Zeleznik as the applicable law to the facts of the case.

## THE CASE STATED

### FACTS

1. Glenn Olbum and Carolyn T. Olbum, his wife, the plaintiffs in the within action are 44 years of age and 42 years of age, respectively, have been married to each other for 23 years and during all of their married life have resided in the City of Pittsburgh where Mr. Olbum has been engaged as a principal in the meat trading business for over 20 years and Mrs. Olbum has primarily been occupied as a housewife and mother to the three Olbum children.

2. Between the years 1965 and 1968, the plaintiffs purchased 139 acres of wooded land in Ligonier Township, Westmoreland County, Pennsylvania, for the purpose of having a weekend and vacation retreat for themselves and their children and in connection therewith they had constructed for them on their property an artificial pond in 1967 and a home, garage/workshop building and guest cabin between the years 1967 and 1971.

3. The defendant, Old Home Manor, Inc., is a Texas corporation engaged in the business of coal mining within the State of Pennsylvania.

4. The defendant has actively mined coal, by both the deep and surface mining method, since 1971.

5. . All of the defendant's coal mining operations, activities and facilities have been and are carried on, maintained and located in Pennsylvania and, in particular, Western Pennsylvania.

6. The defendant obtained permits to strip mine several hundred acres of land in Western Pennsylvania between January 25, 1971 and September 3, 1974 and the defendant did conduct strip mining operations upon said properties.

7. There was a very favorable coal market in 1974.

8. On or about September 27, 1974, plaintiffs and the defendant entered into a certain written agreement and addendum thereto (hereinafter called the "Agreement"), a true and correct copy of which is attached to the plaintiffs' complaint in assumpsit as Exhibit "A".

9. The subject matter of the Agreement is the coal on the plaintiffs' property in Ligonier Township, Westmoreland County, Pennsylvania, the strip mining thereof by the defendant, and the rights, duties and obligations of the parties in connection therewith.

10. On Page 2 of the Agreement, it is provided that the defendant shall work and mine the coal on the plaintiffs' property and Paragraph NINTH of the Agreement provides that the defendant shall pay the plaintiffs a minimum royalty of $3,000.00 per month commencing on October 1,

1974 and continuing monthly thereafter for a period of four years with specific provision to credit payment against future production royalties.

11. The term stated in the Agreement was for a period of four years commencing October 1, 1974 and terminating September 30, 1978.

12. The Agreement contained no "savings" clause.

13. Prior to commencing mining operations on the plaintiffs' land, the defendant obtained strip mining permits for 345.2 acres in Westmoreland County and, in addition, by agreement with Bridge Coal Company, Inc. dated July 20, 1973, acquired the coal mining rights pertaining to the land of Alice M. Barron of Ligonier Township, Westmoreland County, Pennsylvania and did engage in strip mining operations on the Barron property prior to September 27, 1974.

14. The land of Alice M. Barron lies adjacent to the plaintiffs' land and the two properties share a common boundary of approximately 3,600 feet.

15. The defendant mined the plaintiffs' property through November of 1975 and then ceased its strip mining operations on the plaintiffs' land because the remaining coal as of December 1, 1975, was no longer mineable and merchantable and remains unmineable and unmerchantable to the present time.

16. The defendant paid to the plaintiffs minimum royalties of $42,000.00 in the form of fourteen monthly payments of $3,000.00 each for the months of October, November and December of 1974 and January through November of 1975.

17. Following the defendant's last monthly minimum royalty payment to the plaintiffs in November of 1975, it made no further monthly minimum payments as set forth in Paragraph 10 above.

18. The plaintiffs have never been in the coal or coal mining business, have no special knowledge pertaining thereto, and prior to the Agreement executed in September of 1974, they had no knowledge as to the quality or quantity

of coal present upon or beneath their Westmoreland County property.

19. Since the plaintiffs have owned their Westmoreland County property there have been no mining operations conducted thereon except those mining operations conducted by the defendant which commenced in October of 1974.

20. The plaintiffs were aware that there has been some mining activity on their property many years before they bought it but they knew nothing and still know nothing of any particulars or details relative to such prior mining activity.

21. On or about September 27, 1974, the defendant knew or had reason to know that mineable and merchantable coal did exist on the plaintiffs' land and after execution of the Agreement the same was mined by the defendant through November of 1975.

22. At no time, either prior to the execution of the Agreement or subsequent thereto, was there any misrepresentation by the plaintiffs or their attorney as to the quantity or quality of the coal on the plaintiffs' land.

23. Assuming that the defendant owes to the plaintiffs the remaining 34 minimum monthly royalty payments commencing December 1, 1975 through and including September 1, 1978, the total amount due would be $102,000.00 and interest thereon at six (6%) percent per annum would amount to $20,655.00 as of September 1, 1980 and said interest would continue to accrue at the rate of $510.00 per month.

## ISSUES BEFORE THE COURT

Whether, under the facts of this case, the defendant's contractual obligation to pay minimum royalties of $3,000.00 per month to the plaintiffs terminated when the mineable and merchantable coal on the plaintiffs' property became exhausted.

## OTHER MATTERS

1. The court may avail itself and use all the pleadings, exhibits, interrogatories and answers thereto, requests for admissions and answers thereto and affidavits, filed in the instant action in making its determination; however, in the event of any conflicts or inconsistency between said pleadings/affidavits and etc. and this Case Stated, the facts set forth in this Case Stated, shall prevail.

2. If the court is of the opinion that the defendant's obligation to pay the minimum royalties as provided in the Agreement is not excused because of the subsequent exhaustion of mineable and merchantable coal, then judgment shall be entered in the sum of $122,655.00 in favor of the plaintiffs; but if the court is of the opinion that the defendant is excused from its obligation to continue to pay the minimum royalties because of the exhaustion of the mineable and merchantable coal, then judgment shall be entered in favor of the defendant.

3. The parties expressly reserve the right to appeal from the judgment of the court.

This then was the Case Stated. For the following reasons, the decision of the court below is affirmed.

## THE LAW

The appellant-landowners suggest that interpretation of the contract should be under the "Pennsylvania Doctrine" which was an early solution of our courts calling for an automatic decision that "a lease of coal in place with the right to mine and remove all of it for a stipulated royalty vests in the lessee a fee" interest in the coal. (See Brief of Appellant, p. 15).

We reject the use of the "Pennsylvania Doctrine" as unjustified. The assumption that a lease of land for coal mining operations amounts to an automatic "sale in place" of the coal is long out-dated:

Not *every* agreement for the mining of coal, however, amounts to a sale of the coal in place. "A contract

regarding coal in place may be a sale absolute, a conditional sale, a lease in the ordinary expression of that term, or a mere license to make and remove the minerals." *Hummel v. McFadden*, 395 Pa. 543, 150 A.2d 856, 861 (1959) and cases cited therein.

The *Hummel* court stressed that the "unrestricted dominion" contractually given to the miners in that case was the factual basis for a holding that the contract represented a sale of the coal in place.

The most cursory reading of the contract in the instant matter shows that the appellant-landowners executed a document carefully tailored to protect their land, their interests in the land and in the coal payments. In particular, we note that the agreement in question, unlike the agreement in *Hummel* [1] was limited to a term of four (4) years. In short, without lengthy discussion of the matter, we conclude that the instant case should be decided on the general law of contracts, and we approach the matter from that posture.

The appellants point to the language of the Ninth paragraph of the agreement which provides that a minimum royalty payment is due:

> ... on the first day of each and every month thereafter during the primary term hereof, irrespective as to whether or not the quantities of coal strip mined and removed in any particular month during the primary term or any extension shall produce such amounts of royalty....

Appellants also argue strongly that this clause is clear and unequivocal and that this court must, perforce, adhere to the terms as set forth therein. In support of this position, they urge the language of the recent case of *Steuart v. McChesney*, 498 Pa. 45, 48–49, 444 A.2d 659, 661 (1982):

---

1. In *Hummel,* the term of the agreement was "perpetual" rather than for a term of years; there was no minimum royalty provision enforcing prompt performance: payment was only by tonnage, and only when actually sold and not when mined.

... It is well established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement ... As this Court stated in *East Crossroads Center, Inc. v. Mellon-Stuart Co.*, 416 Pa. [229] at 230–231, 205 A.2d [865] at 866, "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence." Hence, where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended. (Citations omitted)

The fallacy in this argument, however, is that *Steuart* may be distinguished rather easily from the problem in the instant matter. There, the court focused entirely on the problem of ambiguity of word meaning, stating that "the flexibility or multiplicity in the meaning of words is the principal source of difficulty" in interpreting a document. The Court then reviewed the clause in dispute and stated unequivocally that it *directly addressed* the matter to be decided:

Indeed, a more clear and unambiguous expression of the Right to First Refusal's exercise price would be onerous to conceive. *Id.*, 498 Pa. at 52, 444 A.2d at 663

It found neither a patent nor a latent ambiguity in the contract and refused to "re-write" the clause in question for the parties.

In contrast, the instant agreement presents a situation in which *no* clause exists to cover the precise contingency which occurred, and the appellants argue that by one sentence in Paragraph Ninth, *supra*, the parties have addressed the issue in another context, so that appellee has "assumed the risk" that the transaction would prove impossible of performance. Therefore they argue, appellee

must pay appellants the $3,000 per month for the entire period of the agreement despite the fact that the coal became unmineable and unmerchantable after the first fourteen months of the time period.[2]

The court below received the case on a Case Stated basis, and the parties specifically agreed that the court was to "avail itself of all the pleadings, exhibits, interrogatories and answers thereto, requests for admissions and answers thereto ..." The court below also quite properly approached the questions presented by the agreement under contract law, and found, again correctly, that this contract was one that depended upon the "continued existence of a particular thing." See Opinion of Honorable Joseph A. Del Sole, dated December 5, 1980. The trial court also apparently rejected appellants' argument based solely on Paragraph Ninth (in part set forth *supra*), that the appellee had assumed the risk of the destruction or deterioration of the supply of coal. Again, we agree.

Restatement of Contracts 2nd sets forth the following wording at § 263:

Destruction, Deterioration or Failure to Come into Existence of Thing Necessary for Performance

If the existence of a specific thing is necessary for the performance of a duty, its failure to come into existence, destruction, or such deterioration as makes performance impracticable is an event the non-occurrence of which was a basic assumption on which the contract was made.

The Comments following state as the "Rationale" the following:

*a. Rationale.* This Section, like the preceding one, states a common specific instance for the application of the rule stated in § 261. *If, as both parties understand, the existence of a specific thing is necessary for the*

2. Appellants have received royalty payments in the fourteen months that the appellee was actually mining the property plus an additional advance payment made at time of execution, for a total of $47,000. At the agreed rate of $2.00 per ton, the contract price, appellants would have been entitled to $17,163.32. Opinion of Lower Court, p. 4.

*performance of a duty it is "a basic assumption on which the contract was made" that that thing will come into existence if it does not already exist and will remain in existence until the time of performance.* Therefore, if its failure to come into existence or its destruction or deterioration makes performance impracticable, the obligor's duty to render that performance is discharged, subject to the qualifications stated in § 261. *Each party bears some of the risk that the transaction will not be carried out for such a reason. Id.* at 328. (Emphasis added)

We think there can be no doubt that both parties thoroughly understood that the contract in question was based upon the existence of two specific veins of coal under the appellants' vacation property. The contract specifically names the veins and attaches a geological survey map. The contract is most thorough in its discussions of all the precautions to be taken by the mining company in its use of the land. Appellants needed no special expertise to be thoroughly cognizant of the underlying assumption upon which they entered this contract.

The provisions of Paragraph Ninth cannot be separated-out from each other or the rest of the contract. Interpretation of an integrated contract is "not limited to cases where it is determined that the language used is ambiguous" ...:

Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. Restatement of Contracts 2nd, comment following § 212 at p. 126.

Paragraph Ninth taken as a whole, decidedly supports the appellee's contention that the provision is one designed to force mining operators to good faith performance and prompt payment and that traditional interpretation of the language has been to that effect. The language quoted *supra* as to payment of $3,000.00 per month "irre-

spective as to whether or not the quantities of coal ... removed in any particular month ... shall produce such amounts of royalty" is immediately followed by language treating the minimum royalties as "credits" to be reconciled against coal removed in the future. Such provisions have long been held to be:

> ... intended as incentives for compliance with the duty of adequate performance and of prompt payment ...

*Boyer v. Fulmer*, 176 Pa. 282, 35 A. 235 (1896). The *Boyer* court then found that the obligation to pay a stated sum but with right to credit in tonnage on that sum in the future did not make the lessee liable if the ore was exhausted:

> ... this obligation proceeded upon the assumption that the ore was there, and continued to be there ... if the ore became exhausted ... the lessee was not bound to pay for it. He could not do an impossible thing and therefore could not be held liable for not doing it. ... *Id*, 176 Pa. at 289, 35 A. at 236–237.

Again, without extensive analysis of all case law and mining law as advanced by the parties, we find that Paragraph Ninth does not set forth definite language that makes appellee responsible for payment when the contract has become impracticable.

■ The Restatement of Contracts 2d at § 261 parallels the above language of the *Boyer* court:

> § 261.  Discharge by Supervening Impracticability
>
> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrance of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, *unless the language or the circumstances indicate the contrary.*[3]  (Emphasis added)

---

**3.** The instant situation presents a genuine problem of impracticability: it presents a case of "the thing cannot be done" as opposed to one of "I cannot do it." The fact that performance is merely beyond a party's capacity to render would not be sufficient to discharge his obligation. See *Id* at p. 318.

In the *absence of special language* or circumstances indicating that a party has *assumed the risk* of guaranteed performance despite the destruction or the deterioration of the thing necessary for performance, performance is discharged. As seen above the comment to § 263 makes it clear that some of the risk of such failure of the transaction is borne by each party, *where the risk has not been specifically assigned.* The opinion of the court below assumed that no specific assignment of the risk had been made and therefore left the parties essentially as it found them, each bearing some of the burden that the two veins of coal would later prove to be unmineable and unmerchantable.

We have already noted that the instant appeal is from the Order of Judge Del Sole who entered a judgment in favor of the defendant/appellee on a Case Stated. Therefore, appellants' argument that Judge Zeleznik, in dismissing appellants' motion for Summary Judgment, improperly assumed certain facts "which were not then and are not now supported by the record" is misplaced. (Brief of appellants at p. 18) However, even assuming that appellants' argument has relevance, we must reject it for the following reasons.

Case law has established the approach to be taken in these circumstances by both the trial and the appellate courts. *Carollo v. Forty-Eight Insulation, Inc.,* 252 Pa.Super. 422, 381 A.2d 990 (1977) sets forth the applicable principles as follows:

> One who moves for a summary judgment has the burden of showing that there is no genuine issue as to any material fact. *Schacter v. Albert,* 212 Pa.Super. 58, 239 A.2d 841 (1968). To do this, the moving party must submit affidavits or other evidence in support of the motion. *Marchese v. Marchese,* 457 Pa. 625, 326 A.2d 321 (1974). The court hearing the motion should accept as true all well-pleaded facts and any admissions on file, but should resolve any doubts as to the existence of a genuine issue of a material fact against the moving party. *Schacter v. Albert, supra.* On appeal, this court must

examine the record in the light most favorable to the appellant. *Speyer, Inc. v. Goodyear Tire & Rubber Co.,* 222 Pa.Super. 261, 295 A.2d 143 (1972). *Id.* 252 Pa.Super. at 427, 381 A.2d at 992.

The court in *Shawville Coal Co. v. Menard,* 280 Pa.Super. 610, 612, 421 A.2d 1099, 1100 (1980) also set forth the following test in passing upon a motion for summary judgment:

> In *Bollinger v. Palmerton Area Com. Endeavor, Inc.,* 241 Pa.Super. 341, 350, 361 A.2d 676, 680 (1976), we stated:
>
>> [I]n passing upon a motion for summary judgment, "it is no part of our function *to decide issues of fact but solely to determine whether there is an issue of fact to be tried* and all doubts as to the existence of a genuine issue as a material fact must be resolved against the party moving for summary judgment. *Schacter v. Albert,* 212 Pa.Super. 58, 239 A.2d 841 (1968)." *Ritmanich v. Jonnel Enterprises, Inc.,* 219 Pa.Super. 198, 203, 280 A.2d 570, 573 (1971) (Emphasis in original.)

Interestingly, *appellants* were the party that had the burden of showing there was no issue of material fact to be decided in the matter to obtain summary judgment. The trial judge, upon review of the record then available to him, analyzed the case properly under the law applicable to summary judgment. The appellants now protest that in his analysis the trial judge relied on "facts" not supported in the record; specifically, appellants' complain of this language:

> [B]oth parties proceeded under the assumption that the plaintiffs' land was underlaid with sufficient mineable and merchantable coal to support defendant's strip mining operations, conducted in a diligent, scientific and workmanlike manner throughout the duration of the lease. This is only common sense. Otherwise, we would be compelled to assume either that the plaintiff had knowledge of a lesser quantity of coal and withheld that

knowledge, or that the defendant was foolish enough to gamble on the existence of coal. (Opinion, p. 3 R. Brief of Appellant p. 18).

Appellants also flatly aver that appellee's "state of mind is immaterial" and that appellants themselves "did not proceed upon any such assumption." (Brief of appellants p. 18)

Yet the trial judge squarely based his decision on his acceptance of "all well-pleaded facts" in the light "most favorable to the non-moving party as required," giving the nonmoving party "the benefit of all reasonable inferences" drawn from those facts. Since the contract, as we have seen *supra,* does not discuss in its wording what the result shall be if the veins of coal were to become unmineable, and since there is an integration clause that states that no other understandings outside the written agreement may be deemed to exist, and since the events leading up to the execution of the agreement are on the record, we see no method the lower court could have employed, other than the one it used. "Reasonable inferences" drawn from "well-pleaded facts" reviewed in the light "most favorable to the non-moving party" provided the only basis available to him for reaching a conclusion based on the facts and the contract itself. He dismissed the appellants' motion for summary judgment.

The parties then presented the case on a Case Stated basis, and enlarged the record with a document containing twenty-three agreed paragraphs of information, (*supra* pp. 3–8) and also agreed that the record as a whole was to be relevant in the determination of the court unless some portion of the record was in conflict with the averments of the Case Stated.

From this record the second trial court also determined that the underlying assumption upon which the contract was based, was that coal in sufficient quantity and quality to make the contract profitable existed in the leased property. That was not an unsupported assumption. The appellee offered the affidavit of an engineer with personal knowl-

edge of the negotiations and the duty of evaluating all reports as to the geologic value of the lands considered for leasing. (R.R. Affidavit in Opposition to Plaintiff's Motion for Summary Judgment, 32a–34a).

The affidavit avers that appellee had profitably mined the property adjoining appellants' land, and that the topography of the area supported the geologic inference that the two seams of coal found on the neighboring land would prove mineable and merchantable on appellants' land as well; that the engineer personally partook in the negotiating process with appellants, and *that appellants were represented in those negotiations by an attorney.*

The facts of the affidavit do not conflict with those of the Case Stated, but they do present an alternative to the interpretations that appellants wished to see prevail. The opinion of Judge Del Sole is brief, but he, like Judge Zeleznik, was forced to interpret the averments of the parties. We assume that upon review he concluded that the focus of this case did not lie in appellants' lack of knowledge of the mining industry, but concluded that after negotiation and by time of execution of the agreement *all* parties were aware of the topographical probability of mineable and merchantable coal on appellants' property, and that *all* parties understood that this was the reason that a lease of coal rights was desirable. Clearly the trial judges were not without discretion to come to such a conclusion.

The "facts," as that term is ordinarily construed, are agreed. What the lower court faced was a difference of *interpretation* of a contract where both parties are attempting to impose their own version of the "intent" supposedly imbuing the contract, which is *in fact silent on the important point.* It is unlikely that either party can produce "facts" beyond those already submitted to the court to "prove" their interpretations. Remanding the matter would therefore be futile; the trial judges have already given the matter careful consideration.

Therefore, as there is evidence below to support the judgment of the trial judge, and as he was clearly within his discretion in deciding as he did, we affirm.

Order affirmed.