**NORFOLK SOUTHERN RAILWAY COMPANY, Plaintiff**

v.

**READING BLUE MOUNTAIN & NORTHERN RAILROAD COMPANY, Defendants**

**No. 3:03 CV 736.**

United States District Court, M.D. Pennsylvania.

Dec. 2, 2004.

Jeffrey D. Cohen, Paul D. Keenan, Janssen & Keenan, P.C., Philadelphia, PA, for Plaintiff.

Charles L. Howard, Christopher M. Roe, Amy Donohue–Babiak, Gollatz, Griffin & Ewing, P.C., Philadelphia, PA, for Defendant.

## MEMORANDUM

MUNLEY, District Judge.

Presently before the court is Defendant Reading Blue Mountain & Northern Railroad Company's ("RBMN") motion for partial summary judgment. Plaintiff Norfolk Southern Railway Company ("Norfolk") opposes this motion. The parties have fully briefed this matter and it is ripe for disposition. For the following reasons, we will grant RBMN's motion.

### I.  Background

RBMN and Norfolk are parties to an agreement entitled "Common C & S Facil-

ities Maintenance Agreement," which governs the parties' responsibilities and rights regarding the maintenance of a communications system which serviced an eleven mile stretch of track in the Lehigh Valley area of Pennsylvania. (Pl.Ex. 3, "Common C & S Facilities Maintenance Agreement") (the "Agreement"). This stretch of track consists of two tracks running parallel to each other near Jim Thorpe, Pennsylvania. (Pl.Ex. 7, Brian Sykes Aff. ¶ 4). Prior to 1996, Conrail owned both tracks. (Def. Ex. A, Wayne Michel Aff. ¶¶ 3–4). In 1996, Conrail sold one of the tracks to RBMN ("Track 1"), but retained ownership over the other ("Track 2"). (*Id.*) Pursuant to this sale, Conrail and RBMN entered into the Agreement to govern the maintenance of the existing communications system. (*Id.* at ¶ 7).

The Agreement regulated the shared maintenance of the communications and signaling system. (Agreement). Train operators and railroad personnel use signaling systems to ensure safe train travel. (Pl.Ex. 7, Brian Sykes Aff. ¶¶ 7–8). The system warns train crews of irregularities or obstructions on the track and instructs them as to how to proceed safely. (*Id.*) The signaling system in place when Conrail and RBMN entered into the Agreement included a series of poles, similar to telephone poles, suspending wires above Tracks 1 and 2. (Def. Ex. A, Wayne Michel Aff. ¶ 7). These wires provided power to the entire system, and also relayed the information for the signal boxes along the tracks to display. (*Id.*) The Agreement provided that Conrail would be responsible for the maintenance of the system, but RBMN would be required to contribute fifty-percent of the maintenance costs. (Agreement). In 1999, Norfolk purchased Track 2 from Conrail and succeeded to Conrail's interests under the Agreement. (Def. Ex. A, Wayne Michel Aff. ¶¶ 3–4) Following the sale, Norfolk and RBMN

also shared the use of their tracks. (Pl. Ex. 7, Brian Sykes Aff. ¶ 10).

On December 25–26, 2002, a severe winter storm (the "storm") severed the communications wires and destroyed the majority of the poles, thus disabling the communications system. (Def. Ex. C, Robert Bortz Depo. at 78–79). Following the damage, RBMN expressed to Norfolk that sharing a communications and signaling system was no longer practical because the original shared system was destroyed. (Pl.Ex. 9, E-mail from Wayne Michel, Jan. 9, 2003). RBMN suggested that each company install and maintain its own communications and signaling system for its own track instead of building a new shared system. (*Id.*) Norfolk intended to continue with the sharing agreement, proposed two options for replacing the pole line system with a new system, and also proposed to rebuild the damaged pole line system. (Def. Ex. 11, Letter From Mark Owens to Wayne Michel, Feb. 3, 2003). Both parties agreed that the old pole and wire system was antiquated, inefficient, dangerous to rebuild, and expensive (Pl.Ex. 6, Jeff Seidel Depo., 60–62), but RBMN did not accept any of Norfolk's proposals for installing an updated system because it did not desire to share a new system with Norfolk. (Def. Ex. 12, Letter from Wayne Michel to Mark Owens, Feb. 4, 2003).

While RBMN and Norfolk negotiated, they continued running trains without signals, a situation they refer to as running "dark" or "form D." (Pl.Ex. 7, Brian Sykes, Aff. ¶ 15). Federal regulations mandate that trains may run without signals for only six months, unless the company receives approval from the Federal Railroad Association ("FRA"). (*Id.*) The FRA restricts the frequency and speed of trains traveling without signals. (*Id.* at 18). Due to a desire to use its track at full

capacity while complying with federal regulations, Norfolk installed a new communications system on its track. (*Id.* at 24). This system uses circuitry within the track to transmit information to the signal boxes, radios for communication, and powers the system with solar paneling. (*Id.* at 24, Pl.Ex. 5, Brian Sykes Depo. at 253–54). This system does not provide signaling to RBMN's track. (Pl.Ex. 7, Brian Sykes Aff. ¶ 32). Norfolk filed suit initiating the case *sub judice* on May 1, 2003. Norfolk seeks recovery from RBMN under the Agreement for its portion of the new circuitry and solar paneling system. RBMN filed a motion for partial summary judgment on April 23, 2004, bringing this case to its present posture.

## II. Jurisdiction

This Court has jurisdiction pursuant to the diversity jurisdiction statute, 28 U.S.C. § 1332. The plaintiff is a Virginia corporation with its principal place of business in Virginia, and the defendant is a Pennsylvania corporation with its principal place of business in Pennsylvania. Because we are sitting in diversity, the substantive law of Pennsylvania shall apply to the instant case. *Chamberlain v. Giampapa,* 210 F.3d 154, 158 (3d Cir.2000) (citing *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

## III. Standard

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Knabe v. Boury,* 114 F.3d 407, 410 n. 4 (3d Cir.1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. *International Raw Materials, Ltd. v. Stauffer Chemical Co.,* 898 F.2d 946, 949 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (1986). A fact is material when it might affect the outcome of the suit under the governing law. *Id.* Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

## III. Discussion

RBMN raises two separate issues in its summary judgment motion. First, it seeks to dismiss Norfolk's claim under the Agreement for contribution for the installation of the new system for Track 1. RBMN argues that the installations are not covered by the Agreement because

Norfolk did not similarly improve Track 2. Second, RBMN seeks declaratory judgment that, under the doctrine of discharge by supervening frustration, it had no contractual obligations to contribute to the replacement of the communications system following the storm. We will address these issues separately. For the reasons that follow, we will first address the frustration of purpose issue, and we will grant the motion for summary judgment on both issues.

## A) Discharge by Supervening Frustration

RBMN argues that the purpose of the Agreement was to maintain the communications system as it existed at the time of the Agreement, and once the existing system was destroyed, the purpose was frustrated. The doctrine of discharge by supervening frustration provides

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate to the contrary.

RESTATEMENT (SECOND) OF CONTRACTS § 265.

■ The restatement further defines an "occurrence" in this context. "If the existence of a specific thing is necessary for the performance of a duty, its failure to come into existence, destruction, or such deterioration as makes performance impracticable is an event the non-occurrence of which was a basic assumption on which the contract was made." RESTATEMENT (SECOND) OF CONTRACTS § 263. The occurrence need not be completely unforeseeable to the contracting parties, but must be unexpected, and not a realistic possibility. *Opera Co. of Boston v. Wolf Trap*

*Foundation,* 817 F.2d 1094, 1100–01 (4th Cir.1987). "The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract." *General Electric Capital Corp. v. Charleston,* No.CIV.A.88–6132, 1989 WL 63213, at *3 (E.D.Pa. June 12, 1989) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 265 cmt).

Pennsylvania law recognizes both the doctrine of supervening frustration and that the destruction of property necessary for the performance of a contract is an event the non-occurrence of which was a basic assumption of the agreement. *See Kroblin Refrigerated Xpress, Inc. v. Pitterich,* 805 F.2d 96, 102 (3d Cir.1986) (citing Restatement (Second) of Contracts § 265 and acknowledging that Pennsylvania law recognizes the doctrine of supervening frustration); *Specialty Tires of America v. CIT Group/Equipment Financing,* 82 F.Supp.2d 434 (E.D.Pa.2000) (quoting Restatement (Second) of Contracts § 263 and noting that the Pennsylvania Supreme Court has adopted the principles contained therein).

■ Thus, where property necessary for the performance of a contract is destroyed by no fault of the parties, the parties' duty to perform under the contract is discharged unless the language of the contract or the circumstances indicate otherwise. *Olbum v. Old Home Manor, Inc.,* 313 Pa.Super. 99, 459 A.2d 757, 761–62 (1983) (applying the doctrine of discharge by supervening frustration and finding that the basic premise of a mining contract was the continued viability of two specific veins of coal because the contract specifically named the two veins and provided a geological map). The Pennsylvania Supreme Court stated, "where a contract relates to a specific property, the existence or maintenance of which is necessary to the carrying out of the purpose of the

agreement, the condition is implied by law ...that the ...frustration of purpose arising from the destruction of the property ...ends all contractual obligations relating to the property." *West v. Peoples First Nat. Bank & Trust Co.*, 378 Pa. 275, 106 A.2d 427, 431–32 (1954).

### i) *The Purpose of the Agreement*

RBMN argues that the purpose of the Agreement was to maintain the signaling and communications system as it existed at the time of the Agreement's formation, and therefore a basic assumption of the Agreement was the continued viability of the pole line system. Norfolk counters that this was not basic assumption because the Agreement anticipates damage to the system. The Agreement allows Norfolk to "inspect, maintain, repair, renew, change, or remove those components of the Common C & S facilities." (Agreement § 1(a)). Norfolk argues that this language demonstrates that the contracting parties anticipated that damage would occur to the pole line and that it was Norfolk's duty under the contract to replace the damaged system. For the reasons that follow, we find that Norfolk's proposed interpretation of the Agreement is unreasonable and that the contracting parties premised the agreement on the existence of the pole line system.

■ A court may grant summary judgment on the interpretation of a contract when the contract is susceptible to only one reasonable interpretation. *Arnold M. Diamond. Inc., v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir. 1999). "A court's purpose in examining a contract is to interpret the intent of the contracting parties, as they objectively manifest it." *Sanford Investment Company, Inc., v. Ahlstrom Machinery Holdings, Inc.*, 198 F.3d 415, 421 (3d Cir.1999) (citations omitted). When the terms of the contract are unambiguous, the express language of the agreement controls its meaning. *Id.* (citing *Pacitti v. Macy's*, 193 F.3d 766, 773 (3d. Cir.1999)). "A term is ambiguous if it is susceptible to reasonable alternative interpretations." *Id.* In determining whether a contract is ambiguous, the court is not limited to a review of the language of the document, but may also consider the context in which the contract was made. *Id.* (citing *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir.1994)).

■ We find that the unambiguous purpose of the Agreement was to maintain the signaling and communication system as it existed at the time of the Agreement. The Agreement states, "[t]he intent of the parties is to *maintain* the *existing* C & S facilities 'in-kind', except as otherwise agreed upon by the parties." (Agreement § 1) (emphasis added). The Agreement specifically identifies the pole line system as part of the communications system and refers to the rest of the system in more general terms. "Whereas, the aforesaid Conrail and RBMN rail lines will utilize, in common with each other, a communications and signal system, including, pole lines, communications facilities and signal facilities and appurtenances between, and including, M & H Junction and Lehighton Junction (hereinafter referred to as 'Common C & S Facilities')." (*Id.*) Thus, the plain language of the Agreement provides an unambiguous expression of the parties' intent that the purpose of the Agreement was to maintain the existing facilities.

The context of the formation of the Agreement reinforces that the only reasonable interpretation of the Agreement is that it was based on the premise that the pole line system could be repaired. When the original signaling system was built, Conrail owned both tracks and therefore built only one power and communications

transmittal system. When Conrail subsequently sold one track while retaining ownership of the other, Conrail and RBMN shared the existing system, thus avoiding the waste of tearing it down to build two separate systems. The Agreement governed the maintenance of a specific system already in place, demonstrating that a basic assumption of the contract was the continued viability of that system.

■ Norfolk argues that the continued existence of the pole line was not a basic assumption of the Agreement because the Agreement specifically allowed Norfolk to "inspect, maintain, repair, renew, change, or remove those components of the Common C & S facilities." (Agreement § 1). Furthermore, it notes that the Agreement provides, "[i]n the event that changes or improvements to the Common C & S Facilities is [sic] required by any law, rule, regulation, or ordinance ... the expense shall be apportioned equally between the parties hereto." (Agreement § 1). We find that the only reasonable interpretation of this language is that it clarifies how Norfolk was to maintain the existing system. Norfolk's interpretation that this language provides an obligation for RBMN to pay for a reconstructed system after the pole line was destroyed ignores the parties' clear expression that their intent was to maintain the existing system. Norfolk's interpretation similarly ignores the lan-

guage in the Agreement that describes the communications system as including a pole line system and ignores the circumstances behind the contract formation. Additionally, under the doctrine of *ejusdem generis*, specific terms in a contract should be read in reference to other specific terms with which they are grouped. *Royal Insurance Co. v. Ideal Mutual Insurance Company*, 649 F.Supp. 130, 135 (E.D.Pa.1986) (citing *Affiliated Food Distributors, Inc. v. Local Union No. 229*, 483 F.2d 418 (3d Cir. 1973)). The parties' intent to maintain the existing system is easily reconciled with the provisions for change and renewal when these terms are read in conjunction with the terms inspect, maintain, and repair. We find that the only reasonable interpretation of the Agreement is that the provisions for change and renewal elaborated the ways in which Norfolk was to maintain the existing system, but do not obligate RBMN to pay for a replacement once the pole line became irreparable.[1] Therefore a basic assumption of the contracting parties was that the existing communications system, including the pole line, would not deteriorate to the point where it could not be repaired.[2]

### ii) *The Destruction of the System*

Additionally, we find that there is no genuine issue of material fact that the storm prevented the parties from main-

---

**1.** Norfolk additionally argues that the provisions for change mandated by law demonstrate that the contracting parties did not assume that the pole line could be repaired. It further argues that the new installations are covered by the Agreement because it could not operate trains without signals for longer than six months without approval of the FRA. The parties, however, agree that the upgrade to in-track circuitry and to solar power is not mandated by law, and that a pole line system would still fulfill federal requirements. (Def. Ex. A, Dick Smith Depo. at 90–91). Thus, for the reasons expressed above, we find that the

provisions for change and renewal mandated by law do not exhibit that the Agreement was not premised on the assumption that the existing system could be repaired.

**2.** For the same reason, we find that the portions of the Agreement highlighted by Norfolk do not constitute "language or circumstances to the contrary" within the meaning of Restatement (Second) of Contracts § 265, and therefore would not mandate the continuance of the Agreement following the frustration of the purpose of the contract.

taining the pole line system. The parties dispute neither the extent of the damage nor that the pole line was damaged beyond repair. Immediately following the storm, RBMN determined that the pole line could no longer serve its existing function. (Pl. Ex. 10, Wayne Michel E-mail, Jan. 23, 2003). Following a survey of the damage, Norfolk also concluded that it could not repair the pole line system, and subsequently replaced it with a system that uses radio communications, electronic circuitry within the track to transmit signal communications, and solar paneling as the power source. (Pl.Ex. 7, Brian Sykes Aff. ¶ 24, Pl.Ex. 5, Brian Sykes Depo. at 253–54).

Had the system merely been damaged, it could have been repaired as provided for in the Agreement. But because it deteriorated beyond repair, it had to be replaced. Brian Sykes, Norfolk's Chief Engineer of Communications and Signals Engineering, wrote "the pole line for the signal and communications system between CP–Lehighton and C–P M & H Jct. on the Lehigh line, Harrisburg Division, was damaged beyond economical repair as a result of a snow storm that occurred on December 25–26, 2002." (Def. Ex. E, Sykes E-mail). Sykes further stated in a deposition that "it was going to be more expensive to try to repair the pole line than it would be to restore with other alternatives available to us." (Def. Ex. B, Brian Sykes Depo. at 210, ln. 4–8). Norfolk's Chief Engineer of Communications and Signals, Dick Smith, testified during questioning by Norfolk's counsel that,

"Q. And was changing the power supply to solar array done because it was the best, most effective and efficient, cost appropriate way to replace the power system which was *destroyed*.

A. Yes."

(Pl.Ex. 16, Dick Smith Depo. at 93–94) (emphasis added).

Robert Bortz, a Signals Supervisor for Norfolk, surveyed the damage the day after the storm and submitted the following in a deposition.

"Q. Do you know where on the pole line or along the pole line the actual damage occurred?

A. Everywhere.

Q. So there was no area—

A. That wasn't affected.

Q. Not affected but the lines were actually down.

A. There were sections across the pole line where the lines were down.

Q. Do you recall the extent of the damage along … the pole line?

A Extensive."

(Def. Ex. C, Robert Bortz Depo. at 79–80).

Norfolk's employees describe the damage to the pole line as so severe that changing, restoring, or maintaining the pole line system made no sense; it had to be replaced. Therefore, we find that there is no genuine issue of material fact that for the purposes of the Agreement, the pole line system was destroyed in the storm from December 25–26, 2002.

Norfolk contends that the damage to the pole line was within the extent anticipated by the Agreement and did not make the performance of the Agreement impracticable. It notes that a portion of the pole line was undisturbed. Norfolk directs us to the deposition of its employee, Edward W. Johnson, Jr., who describes the degree to which the pole line was undisturbed. Johnson testified as follows,

"Q. Are any of the signals in the newly installed system, do any of them receive electric power from a line that is— hangs on a pole line?

A. The new installation at mile post 124 did not require solar power. It was fed from the power service at I don't know the mile post. It wasn't very far. It was just a short—short little span there. Mile post 124 is not solar-powered, it's powered by open power line."

(Pl.Ex. 2, Edward Johnson Depo. at 39, ln. 7–12).

"Q. Is this the same pole line that was—— is this part of the pole line that was destroyed as part of the storm?

A. Yes. It's only a few hundred feet from the service, the Acme parking lot in Jim Thorpe. I know that don't mean nothing, but it's only a few hundred feet from the power—an existing power service. So it was economical for us to power this location using the existing power rather than solar power it."

(Pl.Ex. 2, Edward Johnson Depo. at 39–40).

We find that these excerpts do not show that the communications system, which existed at the time of the Agreement, was repaired. Johnson testifies that the pole line system is used for only "a few hundred feet" and powers a solitary signal. The communications system must service a portion of track eleven miles long. We find that the pole line system was destroyed because Norfolk's employees consistently describe the pole system as damaged beyond repair and Johnson's testimony does not describe repairs or changes to the old pole line, but instead explains how a small remnant of the old pole line has been integrated into a completely new system.

Norfolk also notes that the appurtenances to the pole line remained undisturbed following the storm. Norfolk notes that the pole line system powered relays, switches, control units, electronically charged batteries, and a crossing. (Pl.Ex. 4, Robert Bortz Depo. at 59, ln. 14–23). Norfolk describes the appurtenances as including the "devices, equipment shelters, pole line, [and] structures." (Pl.Ex. 5, Brian Sykes Depo. at 65, ln. 23–24). The Agreement, however, specifically describes the communications system as including a pole line and clearly provides that the contracting parties intended to maintain the existing facilities, of which the pole line system was the central component. Without power or the signals, the appurtenances cease to function as part of a communications system. Thus, the continued viability of the pole line was a basic assumption of the Agreement, and once the pole line could not be repaired, the purpose of the Agreement was frustrated.

■ "The doctrine [of frustration] ultimately represents the ever-shifting line, drawn by courts hopefully responsive to commercial practices and mores, at which the community's interest in having contracts enforced according to their terms is outweighed by the commercial senselessness of requiring performance." *Opera Co. of Boston v. Wolf Trap Found.*, 817 F.2d 1094, 1100 (4th Cir.1987) (quoting *Transatlantic Financing Corporation v. United States*, 363 F.2d 312, 315 (D.C.Cir. 1966)). In the present case, the commercial senselessness of requiring performance far outweighs any community interest in the continual enforcement of the Agreement. Both RBMN and Norfolk agree that maintaining the existing system as required by the Agreement would have been overly dangerous, expensive, and inefficient. While still asserting the continued utility of the Agreement, Norfolk replaced the old system with a new system that does not accommodate both tracks, but only Norfolk's. Norfolk now seeks to hold RBMN liable, under a maintenance

agreement for a preexisting shared system, for the installation of a new system that benefits solely the plaintiff's track. As we have found that the damage to the pole line in the storm caused the system to deteriorate beyond the point where maintenance was practical, and we have also concluded that the purpose of the contract was to maintain the communications system as it existed at the time of the Agreement, we conclude that the purpose of the contract was frustrated by the storm damage. Therefore, we find that under the doctrine of discharge by frustration of purpose, following the storm of December 2002, RBMN's and Norfolk's obligations under the Agreement, are discharged.

## B) Norfolk's Claim under the Agreement.

RBMN seeks summary judgment on Norfolk's claim that RBMN is liable under the Agreement for its portion of the costs of the new installations on Track 2. RBMN argues that it is not liable because the Agreement provides for apportioning costs for a shared or common system and the new system services only Track 2.[3]

■ We find that this argument is moot because we have found that destruction of the existing communications system frustrated the purpose of the Agreement. Once the purpose is frustrated the contractual obligations end. *West v. Peoples First Nat. Bank & Trust Co.*, 378 Pa. 275, 106 A.2d 427, 431–31 (1954); *Olbum v. Old Home Manor, Inc.*, 313 Pa.Super. 99, 459 A.2d 757, 761–62 (1983). Furthermore, as

we have stated above, the Agreement does not cover new installations, and the parties' intent was to govern the maintenance of the existing system, not to apportion costs for the installation of a new system. Thus, Norfolk cannot hold RBMN liable under the Agreement for the new installations following the storm.

Therefore, we will declare that following the storm the purpose of the Agreement was frustrated. Furthermore, we hold that since the contractual obligations were discharged following the storm, RBMN is not liable to Norfolk for any new installations. An appropriate order follows.

### *ORDER*

**AND NOW**, to wit, this second day of December 2004, Defendant's partial motion for summary judgment is hereby **GRANTED**. It is hereby **ORDERED** that:

1) Plaintiff Norfolk Southern Railway Company's claims arising from permanent upgrades to the shared communications system are hereby **DISMISSED**, and

2) it is **DECLARED** that the purpose of the C & S Common Facilities Maintenance Agreement was frustrated following damage to the communications system on December 25–26, 2002, and that the parties' duties to render performance under the Agreement are **DISCHARGED**.

---

3. Norfolk argues that the new system could be altered to accommodate RBMN's track, but does not dispute that the new system currently does not provide signaling to RBMN's track. The parties argue extensively regarding whether the new system is "shared." While RBMN argues that Norfolk's installation of a new system solely for its own benefit frustrated the Agreement's

purpose, it also argues that the destruction of the pole line in the storm frustrated the purpose of the Agreement. As we have found that the storm itself frustrated the purpose of the Agreement, we find no reason to engage in an analysis of whether Norfolk's subsequent installation also frustrated the Agreement's purpose.