SPECIALTY TIRES OF AMERICA, INC., Plaintiff,

v.

THE CIT GROUP/EQUIPMENT FINANCING, INC., Defendant/Third–Party Plaintiff,

v.

Condere Corporation, Titan Tire Corporation, and Titan International, Inc., Third–Party Defendants.

C.A. No. 98–982.

United States District Court, W.D. Pennsylvania.

Feb. 4, 2000.

As Amended March 1, 2000.

Edwin L. Klett, W. Gregory Rhodes, Klett, Lieber, Rooney & Schorling, Pittsburgh, PA, Mary-Jo Rebelo, Paul A. Manion, Manion, McDonough & Lucas, Pittsburgh, PA, B. Earnest Long, Fisher, Long & Rigone, Greenburg, PA, for Specialty Tires of America, Inc.

Michael H. Ginsberg, Peter D. Laun, Jones, Day, Reavis & Pogue, Pittsburgh, PA, for CIT Group/Equipment financing Inc.

Craig M. Geno, Holcomb Dunber, Jackson, MS, for Condere Corp.

George M. Medved, David J. Mongomery, Pepper Hamilton, Pittsburgh, PA, for Titan Tire Corp.

## MEMORANDUM OPINION and ORDER

D. BROOKS SMITH, District Judge.

In this case, Specialty Tires, Inc. ("Specialty") has sued The CIT Group/ Equipment Financing, Inc. ("CIT") for breach of contract arising out CIT's failure to deliver eleven tire presses that it had previously contracted to sell to Specialty. CIT, in turn, has filed a third-party complaint against Condere Corporation, Titan Tire Corporation and Titan International, Inc. (collectively "Condere") arising out of the latter's alleged wrongful refusal to permit those presses to be removed from its factory. Specialty has moved for partial summary judgment, dkt. no. 39, arguing that CIT's defenses are without merit, while CIT has moved for full summary judgment on the ground that its performance was excused under the doctrine of impossibility or commercial impracticability,[1] dkt. no. 42. CIT has also moved, in the alternative, to dismiss the stay I previously entered in the third-party action. dkt. no. 45. For the following reasons, I will grant CIT's motion based on impossibility and deny the other two motions as moot.

### I.

The material facts of this case are simple and undisputed. In December 1993, CIT, a major equipment leasing company, entered into a sale/leaseback with Condere for eleven tire presses located at Condere's tire plant in Natchez, Mississippi, under which CIT purchased the presses from Condere and leased them back to it for a term of years. CIT retained title to the presses, as well as the right to posses-

sion in the event of a default by Condere. In May 1997, Condere ceased making the required lease payments and filed for Chapter 11 bankruptcy in the Southern District of Mississippi.[2] In September 1997, Condere rejected the executory portion of the lease agreement, and the bankruptcy court lifted the automatic stay as to CIT's claim involving the presses.

CIT thus found itself, unexpectedly, with eleven tire presses it needed to sell. Maurice "Maury" Taylor, a former minor candidate for President of the United States[3] and the CEO of Condere and Titan International, stated his desire that the presses be removed quickly and advised CIT on how they might be sold. Later, CIT brought two potential buyers to Condere's Natchez plant, where representatives of Condere conducted them on a tour of the facility. Subsequently, Taylor and CIT negotiated concerning Condere's purchase of the presses, but negotiations fell through, after which Taylor again offered his assistance in locating another buyer.

When no buyer was found, CIT decided to advertise the presses. Specialty, a manufacturer of tires which sought to expand its plant in Tennessee, responded, and in early December 1997, representatives of Specialty, CIT and Condere met to conduct an on-site inspection of the equipment. Condere's representative discussed with CIT's personnel and in the presence of Specialty's agents the logistics concerning the removal of the presses. At that meeting, Condere's representative told CIT and Specialty that CIT had an immediate right to possession of the tire presses, and the right to sell them. At no time did any representative of Condere, whether by words or conduct, express any intent to oppose the removal of this equipment.

---

1. These two terms, while suggesting different levels of difficulty of performance, tend to be used more or less interchangeably, and I will do so as well.

2. *In re Condere Corp.*, No. 97–02549 WEE (Bankr.S.D. Miss. filed May 13, 1997). For a more detailed factual history of the Condere

bankruptcy, see *In re Condere Corp.*, 228 B.R. 615 (Bankr.S.D.Miss.1998).

3. *See, e.g.*, Stanley Ziemba, *Titan Wheel's Taylor Back at Work*, Chicago Tribune, Apr. 10, 1996, at B1, 1996 WL 2660678; Andrew E. Serwer, *Taylor: Made for President?*, Fortune, Apr. 3, 1995, at 18, 1995 WL 8105190.

*CIT Group/Equipment Financing, Inc. v. Condere Corp.*, typescript at 8–9, No. 5:98cv5BrS (S.D.Miss. Jan. 27, 2000).[4] The negotiations proved fruitful, and, in late December 1997, CIT and Specialty entered into a contract for the sale of the presses for $250,000. CIT warranted its title to and right to sell the presses.

Events then took a turn which led to this lawsuit. When CIT attempted to gain access to the presses to have them rigged and shipped to Specialty, Condere refused to allow this equipment to be removed from the plant. This refusal was apparently because Condere had just tendered a check to CIT for $224,000, without the approval of the bankruptcy court, in an attempt to cure its default under the lease. *See Condere Corp.*, typescript at 3, 9. This unexpected change in position was rejected by CIT, which promptly filed a complaint in replevin in the Southern District of Mississippi to obtain possession.[5] Condere then posted a bond and the replevin court removed the action from the expedited list, scheduling a case management conference for April 1998. It became clear at that juncture that Specialty was not going to obtain its tire presses expeditiously.

CIT then advised Specialty that the presses were subject to the jurisdiction of the bankruptcy court and suggested that Specialty either withdraw its claim to the equipment and negotiate with CIT for a sum of liquidated damages or make a bid for the presses at any auction that might be held by that court. Specialty, as was its right, rejected both suggestions and affirmed the existing contract, demanding performance. To date, Condere has refused to surrender to CIT, and CIT has failed to deliver to Specialty, the tire presses.

Subsequent to the briefing of these motions, the replevin court has issued findings of fact and conclusions of law to the effect that Condere wrongfully retained possession of the presses and that CIT is entitled to remove them immediately. *Condere Corp.*, typescript at 17. Although Condere may appeal this ruling, CIT has informed Specialty that it is still willing to deliver the presses as soon as it gains possession, and Specialty has indicated its interest in accepting them, in "partial" settlement of its claims.

## II.

Summary judgment is appropriate where admissible evidence fails to demonstrate a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). If the nonmoving party bears the burden of persuasion at trial, the moving party must show that the nonmoving party's evidence is insufficient to carry that burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party can create a genuine issue of material fact by pointing to evidence in the record sufficient to support a jury verdict in its favor at trial. *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 330 (3d Cir.1995). Alternatively, "the burden on the moving party may be discharged by showing … that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548 (internal quotation marks omitted). "[S]ince a complete failure of proof concerning an essential element," *id.* at 323–24, 106 S.Ct. 2548, on which a party bears the burden of proof at trial establishes that the moving party is "entitled to a judgment as a matter of law," the nonmoving party must establish the existence of every element essential to its case. *Id.* Such evidence must be significantly probative and more than "merely colorable." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994).

Once the moving party has satisfied its burden, the nonmoving party is required

---

4. I take judicial notice of the findings of fact issued by the replevin court involving these parties.

5. *CIT Group/Equipment Financing, Inc. v. Condere Corp.*, No. 5:98cv5BrS (S.D.Miss. Jan. 9, 1998).

by Fed.R.Civ.P. 56(e) to establish that there remains a genuine issue of material fact. *Clark v. Clabaugh*, 20 F.3d 1290, 1294 (3d Cir.1994). The nonmovant "may not rest upon mere allegation or denials of [its] pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law ..." *id.* at 248, 106 S.Ct. 2505, and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 257, 106 S.Ct. 2505.

In determining whether a nonmovant has established the existence of a genuine issue of material fact requiring a jury trial, the evidence of the nonmovant must "be believed and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. 2505. Whether an inference is justifiable, however, depends on the evidence adduced. *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 595–96, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n. 12 (3d Cir.1990). Likewise, "simply show[ing] that there is some metaphysical doubt as to the material facts" does not establish a genuine issue for trial. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348.

### III.

In the overwhelming majority of circumstances, contractual promises are to be performed, not avoided: *pacta sunt servanda*, or, as the Seventh Circuit loosely translated it, "a deal's a deal." *Waukesha Foundry, Inc. v. Industrial Engineering, Inc.*, 91 F.3d 1002, 1010 (7th Cir.1996) (citation omitted); *see generally* John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 13.1, at 495 (4th ed.1998). This is an eminently sound doctrine, because typically

> a court cannot improve matters by intervention after the fact. It can only destabilize the institution of contract, increase risk, and make parties worse off.... Parties to contracts are entitled to seek, and retain, personal advantage; striving for that advantage is the source of much economic progress. Contract law does not require parties to be fair, or kind, or reasonable, or to share gains or losses equally.

*Industrial Representatives, Inc. v. CP Clare Corp.*, 74 F.3d 128, 131–32 (7th Cir. 1996) (Easterbrook, J.). Promisors are free to assume risks, even huge ones, and promisees are entitled to rely on those voluntary assumptions.[6] Calamari & Perillo, *supra* § 13.16, at 522. Futures contracts, as just one example, are so aleatory that risk-bearing is their sole purpose, yet they are fully enforceable. *See id.* § 13.2, at 496; 4 Ronald A. Anderson, *Uniform Commercial Code* § 2–615:69 (3d ed.1997) (performance not excused even if seller is unable to obtain goods).

Even so, courts have recognized, in an evolving line of cases from the common law down to the present, that there are limited instances in which unexpectedly and radically changed conditions render the judicial enforcement of certain promises of little or no utility. This has come to be known, for our purposes, as the doctrines of impossibility and impracticability.[7] Because of the unexpected nature

---

6. Indeed, this very defendant successfully enforced a contract in which a sublessee of a computer was required to remit rent payments to it as assignee of the prime lessee, even though the prime lessee had defaulted on its rent payments and the prime lessor demanded payment by the sublessee, essentially forcing the sublessee to pay twice. The sublessee had assumed the risk of a default further up the chain by agreeing to a "hell or high water clause." *See Colorado Interstate Corp. v. CIT Group/Equipment Financing, Inc.*, 993 F.2d 743, 746 (10th Cir.1993).

7. The reported cases on this topic, unfortunately, are not characterized by either consistency or clarity of expression. As one respected treatise puts it, "Students who have

of such occurrences, litigated cases usually involve, not interpretation of a contractual term, but the judicial filling of a lacuna in the parties agreement. *See* 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 9.5, at 603 (2d ed.1998); 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 3–10, at 169 (4th ed.1995). Such "gap-filling," however, must be understood for what it is: a court-ordered, as opposed to bargained-for, allocation of risk between the parties. *Albert M. Greenfield & Co. v. Kolea,* 475 Pa. 351, 380 A.2d 758, 760 (1977); John E. Murray, Jr., *Murray on Contracts* § 112, at 635–36 (3d ed.1990). As such, it must be applied sparingly. *Dorn v. Stanhope Steel, Inc.,* 368 Pa.Super. 557, 534 A.2d 798, 812 (1987).

Traditionally, there were three kinds of supervening events that would provide a legally cognizable excuse for failing to perform: death of the promisor (if the performance was personal), illegality of the performance, and destruction of the subject matter; beyond that the doctrine has grown to recognize that

> relief is most justified if unexpected events inflict a loss on one party and provide a windfall gain for the other or where the excuse would save one party from an unexpected loss while leaving the other party in a position no worse than it would have without the contract.[8]

Calamari & Perillo, *supra* § 13.1, at 496; *see also* 2 Farnsworth, *supra* § 9.6, at 612. Thus, the Second Restatement of Contracts expresses the doctrine of impracticability this way:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 261 (1981). Article 2 of the U.C.C., which applies to the sale of goods presented by the case *sub judice,* puts it similarly:

> Delay in delivery or non-delivery in whole or in part by a seller ... is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made....

U.C.C. § 2–615(1) (codified at 13 Pa.C.S. 2615(1)).

The principal inquiry in an impracticability analysis, then, is whether there was a contingency the non-occurrence of which was a basic assumption underlying the contract. It is often said that this question turns on whether the contingency was "foreseeable," 2 Farnsworth, *supra* § 9.6, at 616, on the rationale that if it was, the promisor could have sought to negotiate explicit contractual protection. *See Waldinger Corp. v. CRS Group Eng'rs, Inc.,* 775 F.2d 781, 786 (7th Cir.1985); *Yoffe v. Keller Indus., Inc.,* 297 Pa.Super. 178, 443 A.2d 358, 362 (1982); *Luria Engineering Co. v. Aetna Cas. & Sur. Co.,* 206 Pa.Super. 333, 213 A.2d 151, 153–54 (1965).[9] This, however, is an incomplete and sometimes misleading test. Anyone can foresee, in some general sense, a

---

concluded a first year contracts course in confusion about the doctrine of impossibility and have since ... found that the cases somehow slip through their fingers when they try to apply them to new situations[ ] may take some comfort in knowing that they are in good company." 1 White & Summers, *supra* § 3–10, at 164.

**8.** The second of these two grounds is what economists deem a "Pareto-optimal" move; that is, an adjustment that makes some parties better off and none worse off than they were initially. For an economic analysis of the law of impossibility, see Hon. Richard A. Posner, *Economic Analysis of Law* § 4.5 (5th ed.1998).

**9.** Indeed, this rationale can be traced down to the root of the impossibility doctrine at common law as expressed by *Paradine v. Jane,* Aleyn 26, 82 Eng. Rep. 897 [1647]. *See* Murray, *supra* § 112, at 634.

whole variety of potential calamities, but that does not mean that he or she will deem them worth bargaining over. *See* Calamari & Perillo, *supra* § 13.18, at 526; Murray, *supra,* § 112, at 641 ("If 'foreseeable' is equated with 'conceivable', nothing is unforeseeable"). The risk may be too remote, the party may not have sufficient bargaining power, or neither party may have any superior ability to avoid the harm. 2 Farnsworth, *supra,* § 9.6, at 617. As my late colleague Judge Teitelbaum recited two decades ago in a famous case of impracticability:

> Foreseeability or even recognition of a risk does not necessarily prove its allocation. Parties to a contract are not always able to provide for all the possibilities of which they are aware, sometimes because they cannot agree, often because they are too busy. Moreover, that some abnormal risk was contemplated is probative but does not necessarily establish an allocation of the risk of the contingency which actually occurs.

*Aluminum Co. of Am. v. Essex Group, Inc.,* 499 F.Supp. 53, 76 (W.D.Pa.1980) (applying Indiana law) (quoting *Transatlantic Financing Corp. v. United States,* 363 F.2d 312 (D.C.Cir.1966) (Skelly Wright, J.)) (internal ellipses omitted); *accord Opera Co. v. Wolf Trap Found.,* 817 F.2d 1094, 1101 (4th Cir.1987) (also quoting *Transatlantic*). So, while the risk of an unforeseeable event can safely be deemed not to have been assumed by the promisor, the converse is not necessarily true. *See* Restatement (Second) of Contracts § 261 cmt. c. Properly seen, then, foreseeability, while perhaps the most important factor, is at best one fact to be considered in resolving first how likely the occurrence of the event in question was and, second, whether its occurrence, based on past experience, was of such reasonable likelihood that the obligor should not merely foresee the risk but, because of the degree of its likelihood, the obligor should have guarded against it or provided for non-liability against the risk.

*Wolf Trap,* 817 F.2d at 1102–03 (quoted in Farnsworth, *supra* § 9.6, at 617–18).[10]

■ It is also commonly said that the standard of impossibility is objective rather than subjective-that the question is whether the thing can be done, not whether the promisor can do it. 2 Farnsworth, *supra* § 9.6, at 619. This too is more truism than test, although Pennsylvania courts have couched their decisions in this rhetoric. *See Luber v. Luber,* 418 Pa.Super. 542, 614 A.2d 771, 774 (1992); *Craig Coal Mining Co. v. Romani,* 355 Pa.Super. 296, 513 A.2d 437, 439 (1986).[11] Indeed, the First Restatement took such an approach, *see* Calamari & Perillo, *supra* § 13.15, at 521, but the Second simply applies "the rationale ... that a party generally assumes the risk of his own inability to perform his duty." *Craig Coal,* 513 A.2d at 439 (quoting Restatement (Second) of Contracts § 261 cmt. e). This holds particularly when the duty is merely to pay money. *See Luber,* 614 A.2d at 774. It is therefore "preferable to say that such ['subjective'] risks as these are generally considered to be sufficiently within the control of one party that they are assumed by that party." 2 Farnsworth, *supra* § 9.6, at 619–20. It is, of course, essential that the impossibility asserted by the promisor as a defense not have been caused by the promisor. *Id.* § 9.6, at 613–14; *Dorn,* 534 A.2d at 812; *Craig,* 513 A.2d at 440.

■ Generally speaking, while loss, destruction or a major price increase of fun-

---

10. Another respected text defines the unforeseeable as "an event so unlikely to occur that reasonable parties see no need explicitly to allocate the risk of its occurrence, although the impact it might have would be of such magnitude that the parties would have negotiated over it, had the event been more likely." Calamari & Perillo, *supra,* § 13.18, at 526.

11. I do not mean to suggest that these courts in any way reached the wrong result or engaged in faulty analysis. Rather, in those cases the traditional formulation of the test yielded the unmistakably correct conclusion that the promisor had assumed the risk of his own inability to perform.

gible goods will not excuse the seller's duty to perform, the rule is different when the goods are unique, have been identified to the contract or are to be produced from a specific, agreed-upon source. In such a case, the nonexistence or unavailability of a specific thing will establish a defense of impracticability. Murray, *supra*, § 113, at 649, 650; *accord Olbum v. Old Home Manor, Inc.*, 313 Pa.Super. 99, 459 A.2d 757, 761 (1983); *Lichtenfels v. Bridgeview Coal Co.*, 366 Pa.Super. 304, 531 A.2d 22, 26 (1987); *Selland Pontiac–GMC, Inc. v. King*, 384 N.W.2d 490, 492–93 (Minn.App. Ct.1986); Restatement (Second) of Contracts § 263 (1981); White & Summers, *supra* § 3–10, at 175–76. Thus, § 263 of the Second Restatement recites:

> If the existence of a specific thing is necessary for the performance of a duty, its failure to come into existence, destruction, or such deterioration as makes performance impracticable is an event the non-occurrence of which was a basic assumption on which the contract was made.

Moreover, the Supreme Court of Pennsylvania has interpreted this section's predecessor in the First Restatement to apply to, in addition to physical destruction and deterioration, interference by third parties with a specific chattel necessary to the carrying out of the agreement. *Greenfield*, 380 A.2d at 759 (quoting *West v. Peoples First Nat'l Bank & Trust Co.*, 378 Pa. 275, 106 A.2d 427 (1954)); *accord Yoffe*, 443 A.2d at 362 (acts of third parties sufficient if not foreseeable); *Luria*, 213 A.2d at 153 (same).

Thus, in *Olbum*, the plaintiffs leased the mineral rights of specific portions of their land to a coal mining concern, in exchange for minimum royalty payments extending over four years. After successfully mining the land for a little over a year, defendant ceased its mining operations because the remaining coal had become unmineable and unmerchantable. 459 A.2d at 759. Plaintiffs then sued to recover the remaining royalty payments, but the court held that because the contract depended upon the "continued existence of a particular

thing," *id.* at 761, specifically mineable coal, the contract was discharged for supervening impracticability. *Id., passim.*

In *Yoffe*, the promisor owed a contractual duty to file a securities registration statement with the SEC and effect registration within a set time. The SEC, however, unforeseeably undertook an investigation of its accounting practices, delaying the approval and causing damage to the promisee. The court held that, because the third party (SEC)'s actions were unforeseeable, the promisor was discharged. 443 A.2d at 363.

Likewise, in *Selland*, the promisor contracted to sell school bus bodies produced by a particular company, Superior. After the contract was entered into, and without the knowledge of any party, Superior became insolvent and the bodies were never delivered. The promisee then sued the promisor for breach of contract, but the court, applying § 2–615 of the U.C.C., held that the contract was discharged as impracticable. 384 N.W.2d at 492–93.

In *Litman v. Peoples Natural Gas Co.*, 303 Pa.Super. 345, 449 A.2d 720 (1982), the promisee contracted with defendant gas company to install gas service to an apartment building. Defendant-promisor was unable to perform, however, because the state utility commission subsequently forbade defendant from making any new connections. Plaintiff sued for breach, but the court held that performance was discharged as impossible, owing to the interference of the third-party regulatory body. *Id.* 449 A.2d at 724–25.

Finally, in *Waldinger*, the court applied impracticability to a situation in which a thirdparty engineer unforeseeably required, contrary to industry custom, strict compliance with a standard, making the promisor-defendant's delivery of a compliant machine, as required by contract, impossible. 775 F.2d at 787–89.

■ The situation presented here is in accord with these cases. To recapitulate, CIT contracted to supply specific tire

presses to Specialty. This was not a case of fungible goods; Specialty inspected, and bid for, certain identified, used presses located at the Natchez plant operated by Condere. All parties believed that CIT was the owner of the presses and was entitled to their immediate possession; Condere's representatives stated as much during the inspection visit. Neither Specialty nor CIT had any reason to believe that Condere would subsequently turn an about-face and assert a possessory interest in the presses. The most that can be said is that CIT had a course of dealings with Condere, but nowhere is it argued that there was any history of tortious or opportunistic conduct that would have alerted CIT that Condere would attempt to convert the presses to its own use.

Thus, whether analyzed traditionally in terms of foreseeability, as courts apply that term, or by the risk-exposure methodology outlined *supra*, it is clear that this is not the sort of risk that CIT should have expected to either bear or contract against. In economic terms, which I apply as a "check" rather than as substantive law, it cannot be said with any reliability that either Specialty or CIT was able to avoid the risk of what Condere did at a lower cost. It was "a bolt out of the blue" for both parties. On the other hand, Specialty was in a better position to know what consequences and damages would likely flow from nondelivery or delayed delivery of the presses. This suggests that Specialty is the appropriate party on which to impose the risk, *See* Posner, *supra* § 4.5, at 118; Calamari & Perillo, *supra* § 13.2, at 498. Moreover, judicial discharge of CIT's promise under these circumstances leaves Specialty in no worse a position than it would have occupied without the contract; either way, it would not have these presses, and it has only been able to locate and purchase three similar used presses on the open market since CIT's failure to deliver. On the other hand, CIT is relieved of the obligation to pay damages. Accordingly, excuse for impracticability would appear to be a Pareto-optimal move, note 8, *supra,* increasing CIT's wel-

fare while not harming Specialty. This too is a valid policy reason for imposing the risk of loss on Specialty. *See* Calamari & Perillo, *supra* § 13.1, at 496. Thus, economic analysis confirms as sound policy the result suggested by the caselaw discussed *supra.*

Plaintiff makes much of the argument that there was no "basic assumption" created by Condere upon which Specialty and CIT based their contract, stating that it relied upon CIT's representations alone. Dkt. no. 44, at 13. This is specious. As a matter of both law and logic, a basic assumption of any contract for the sale of specific, identified goods is that they are, in fact, available for sale. Accordingly, I reject this contention and conclude that the actions of Condere in detaining the presses presents sufficient grounds on which to base an impracticability defense.

Plaintiff also argues that this is a case only of subjective impossibility, presumably because Condere—which has been holding the presses essentially hostage—could deliver them up to Specialty. Thus, plaintiff contends that only CIT is incapable of performing and therefore should not be excused. This proves too much; in theory, at least, any hold-out party can be brought to the table if the price is high enough, including the parties in the cases discussed *supra.* Certainly, if CIT offered Condere $3 million to surrender the presses, there is little doubt that they would comply, but the law of impracticability does not require such outlandish measures. In *Lichtenfels,* the promisor was unable to obtain a mining permit because one of ten owners held out for more money, yet the contract to mine was still discharged as impracticable. 531 A.2d at 24–26. Under Pennsylvania law, "impossibility" also encompasses "impracticability because of extreme and unreasonable difficulty, expense or loss involved." *Greenfield,* 380 A.2d at 759. This is simply not a case in which CIT became insolvent and could not perform, or in which the market price of tire presses spiked upward due to a shortage,

making the contract unprofitable to CIT. While CIT did assume the risk of its own inability to perform, it did not assume the risk of Condere making it unable to perform by detaining the presses, any more than CIT assumed the risk that thieves would steal the presses from Condere before the latter could deliver them.[12] In sum, this risk was not "sufficiently within the control of [CIT] that [it should be inferred that it was] assumed by that party." 2 Farnsworth, *supra* § 9.6, at 619–20. It was completely within the control of Condere.[13]

 Accordingly, I conclude on this record that CIT has made out its defense of impracticability. The ruling of the replevin court, however, indicates that CIT's performance is impracticable only in the temporary sense. Temporary impracticability only relieves the promisor of the obligation to perform as long as the impracticability lasts and for a reasonable time thereafter. *Moudy v. West Va. Pulp & Paper Co.*, 385 Pa. 39, 121 A.2d 881, 883 (1956); *accord In re 222 Liberty Assocs.*, 101 B.R. 856, 862 (Bankr.E.D.Pa.1989); Calamari & Perillo, *supra* § 13.13, at 519. Once it receives possession of the presses, CIT asserts that it stands ready and willing to perform its contract with Specialty. Dkt. no. 46, at 4. That issue is not ripe for adjudication and must await a separate lawsuit if CIT should fail to perform after obtaining possession. Suffice it to say that, to the extent Specialty seeks damages for nondelivery of the presses to date, CIT is excused by the doctrine of impracticability and is entitled to full summary judgment.

An appropriate order follows.

12. In that hypothetical, the thieves could no doubt be induced to hand over the presses for a ransom, and thus someone is "capable" of performing. This shows in stark relief the absurdity of plaintiff's argument.

13. This fact pattern points up the conceptual weakness of the "I cannot do it versus it cannot be done" rendition of the objec-

## ORDER

AND NOW, this fourth day of February 2000, upon consideration of plaintiff's motion for partial summary judgment, dkt. no. 39, defendant CIT Group/Equipment Financing's motion for summary judgment, dkt. no. 42, defendant CIT Group/Equipment Financing's motion to lift stay against third-party defendants, dkt. no. 45, and the responses thereto, it is hereby ORDERED and DIRECTED that:

1. defendant CIT Group/Equipment Financing's motion for summary judgment, dkt. no. 42, is GRANTED;

2. plaintiff's complaint is DISMISSED WITH PREJUDICE;

3. defendant CIT Group/Equipment Financing's third-part complaint is DISMISSED WITHOUT PREJUDICE AS MOOT;

4. all other remaining motions are DENIED AS MOOT;

5. the Clerk of Court shall mark the above-captioned civil action CLOSED.

tive/subjective test. Technically, someone could perform, but that someone is in all likelihood a tortfeasor that CIT has had to resort to judicial intervention to bring to heel. Thus, while this case may be seen as one of "I cannot do it," it is still not appropriate to treat as one in which a promisor merely underestimates the financial or technical resources it will need in order to perform.