**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1179
_____

REBECCA LEONARD; MATTHEW LEONARD, by and through their parents and next
friends, Joe H. Leonard, Jr and Virginia G. Leonard; ELISHA ROTHMAN, by and
through her parents and next friends, Marsha E. Rothman and Barry Rothman;
KIMBERLY HOFFMAN, by and through her parents and next friends, Claire Hoffman
and Stephen Hoffman; MICHAEL BOSS, by and through his parents and next friends,
Ronald Boss and Ruth Thomas; MICHAEL UNGER, by and through
his parents and next friends, Francis J. Unger and Rae M. Unger

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES


Kimberly Hoffman, by and through her parents and next friends,
Claire Hoffman and Stephen Hoffman,
                                                        Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-11-cv-07418)
District Judge: Honorable Harvey Bartle III
_____

Submitted Under Third Circuit L.A.R. 34.1(a) on October 29, 2024

Before: CHAGARES, *Chief Judge*, PORTER, and CHUNG, *Circuit Judges*.

(Filed: December 20, 2024)

_____

OPINION*

_____

PORTER, *Circuit Judge*.

I

Kimberly Hoffman is an adult woman with autism who requires full-time care. In 2011, Kimberly and her parents (collectively, the "Hoffmans") sued Pennsylvania's Department of Human Services ("DHS") for not providing Kimberly with the medical services guaranteed to her by federal law. The District Court found DHS to be in violation of federal law and ordered that a trial be held to determine the appropriate relief.

In lieu of proceeding to trial, the Hoffmans and DHS entered into a settlement agreement in 2014. That agreement requires DHS to "identify and reach agreement with a [third-party] provider" that will deliver services and care to Kimberly. App. 20e. The agreement's terms are demanding. Among its other provisions, the agreement stipulates that Kimberly receive 24/7 care, in a one-person residence that is no more than 10 miles from her parents' home and from staff "who have experience in serving people with Autism." App. 20f; *see also* App. 20e, 20h.

For their part, the Hoffman's must "cooperate with DHS and potential Residential Habilitation providers during the process of identifying, procuring, and reaching agreement on an acceptable Residential Habilitation provider." App. 20f. Although the

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

agreement permits the Hoffmans to reject providers proposed by DHS, they cannot "unreasonably withhold their approval." *Id.*

Unfortunately, in the many years since the agreement was made, Kimberly has yet to be placed with a provider that satisfies the terms of the agreement. From 2017 to 2020, the parties worked with Step-by-Step, Inc., a provider that, due to staffing issues, could only ever deliver 6 hours of care exclusively on weekdays—far short of the 24/7 care that the settlement agreement contemplated.

The parties' most recent attempt to secure a provider precipitated this appeal. In December 2021, DHS identified Supportive Concepts for Families, Inc. ("Supportive Concepts") as a possible provider, and in August 2022, Kimberly initially approved. From early September to late December, DHS and Supportive Concepts worked to transfer title of the residence at which Supportive Concepts would provide care to Kimberly. Then suddenly, Kimberly withdrew her approval for Supportive Concepts on January 10, 2023. In an email drafted by Kimberly's farther, Kimberly cited the "betray[al of] her trust," "broken promises," "abandonment of any outreach/communication for months," among "numerous other issues," that led to her decision. App. 851. That rejection was the final straw for DHS.

On April 20, 2023, DHS filed a motion for relief from the terms of the settlement agreement arguing that the Hoffmans materially breached their obligation to not "unreasonably withhold their approval" and that, in the alternative, the settlement agreement was impracticable. App. 540; *see also* App. 537–60i. The District Court held an evidentiary hearing on DHS's motion and concluded that the settlement agreement

3

was impracticable under Pennsylvania contract law and discharged each party's obligation of performance. Although it noted that "[the Hoffmans'] conduct has not made it easy for DHS," App. 018, the District Court did "not reach the issue as to whether the Hoffmans breached the settlement agreement for failure to cooperate with DHS." App. 020 n.6. The Hoffmans appealed.[1]

II[2]

On appeal, the Hoffmans argue that the District Court erred in concluding that the settlement agreement is impracticable under Pennsylvania contract law.[3] We agree with the Hoffmans that impracticability is a looser-than-ideal fit for the facts of this case. Although we recognize that the District Court may have intended to apply the related doctrine of mutual mistake of fact, we decline to rule in the first instance whether a mutual mistake of fact existed here. For the reasons below, the District Court erred in holding that the agreement was impracticable.

Under Pennsylvania contract law, impossibility of performance "means not only strict impossibility but impracticability because of extreme and unreasonable difficulty,

---

[1] The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 and we have jurisdiction over its final judgment under 28 U.S.C. § 1291.

[2] We review "a district court's findings of fact for clear error and its conclusions of law *de novo*." *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 282–83 (3d Cir. 2014). "For mixed questions of law and fact 'we apply the clearly erroneous standard except that the District Court's choice and interpretation of legal precepts remain subject to plenary review.'" *Id.* at 283 (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 201 (3d Cir. 2005)).

[3] Both parties agree that Pennsylvania law applies.

expense, or loss involved." *West v. Peoples First Nat'l Bank & Trust Co.*, 106 A.2d 427, 432 (Pa. 1954) (citing Restatement (First) of Contracts § 454 (Am. L. Inst. 1932)). For an agreement to be impracticable, there must be a supervening event the non-occurrence of which was a basic assumption of the parties. Restatement (Second) of Contracts § 261, cmt. b (Am. L. Inst. 1981); *9795 Perry Hwy. Mgmt., LLC v. Bernard*, 273 A.3d 1098, 1104 (Pa. Super. Ct. 2022) (quoting the Restatement (Second) of Contracts § 261). Traditionally, the doctrine of impracticability has been applied in three types of cases: (1) cases involving the "supervening death or incapacity of a person necessary for performance"; (2) cases involving the "supervening destruction of a specific thing necessary for performance"; and (3) cases involving a "supervening prohibition or prevention by law." Restatement (Second) Contracts § 261, cmt. a.

As the Hoffmans note, the obstacle encountered here—the parties' inability to locate a suitable third-party provider capable of delivering care consistent with the terms of the agreement—does not fall neatly into any of those traditional categories. The Hoffmans also correctly observe that there is no "supervening event" of the sort regularly required for an agreement to be found impracticable. DHS has not argued, for instance, that the number of suitable providers was reduced by an unforeseen event like a sudden economic downturn or new burdensome regulations. Rather, the District Court essentially concluded that although the settlement agreement assumed the existence of a provider able to deliver 24/7 care to Kimberly in a one-person residential setting no more than 10 miles from her parents' home, experience has demonstrated the error of that assumption:

> [I]t was a basic assumption of all parties to the settlement agreement that there were satisfactory service providers in the community. Not any possible provider would do. The terms of the settlement agreement were quite specific. The provider must be one which "has experience in serving people with Autism Spectrum Disorder," to say nothing of having to provide 24-hour services in a one-person residence within a narrow geographic area. In drafting the settlement agreement, the parties provided aggressive deadlines for DHS to identify and recommend service providers for the Hoffmans. This confirms that all parties believed such providers to be ready and able to accept this responsibility. The assumption of the parties turned out not to be well-founded.

App. 017 (quoting App. 20g); *see also* App. 018–19 ("It is clear that after more than eight years of continued effort by DHS and the Hoffmans to find acceptable providers, none has been found or is likely to be found that meets the stringent demands of the settlement agreement.").

The District Court draws our attention to two cases where courts found a contract to be impracticable under Pennsylvania contract law. A close reading of those cases, however, reinforces our impression that impracticability is too loose a fit for the facts of this case. In *Litman v. Peoples Natural Gas Co.*, an intermediate state appellate court held that a contract for the sale of gas between a buyer and gas company was impracticable after Pennsylvania's public utility commission prohibited the sale of gas beyond a company's peak capacity. 449 A.2d 720, 724–25 (Pa. Super. 1982). There, the court's impracticability finding was based on the supervening "legal[] preclu[sion] from providing the gas service." *Id.* at 725.[4] Next, in *Specialty Tires of America*, a federal

---

[4] In *Litman* the buyer had requested gas service in the fall of 1974, but the supervening illegality was an order of the Public Utility Commission issued on February 15, 1972. *Litman*, 449 A.2d at 722. Although the 1972 order preceded the 1974 agreement, it appears that the 1972 order did not become effective as to the gas company in question

district court held that a contract for the sale of unique goods between a buyer and seller was impracticable under Pennsylvania law after a third party asserted a possessory interest in the goods to be sold. *Specialty Tires of Am., Inc. v. CIT Grp./Equip. Fin., Inc.*, 82 F. Supp. 2d 434, 436, 440–41 (W.D. Pa. Feb. 4, 2000). Again, the court's impracticability finding was based on the supervening "interference by third parties with a specific chattel necessary to the carrying out of the agreement." *Id*. at 440. The court explained that:

> [the buyer had] inspected, and bid for, certain identified, used presses . . . [that] [a]ll parties believed that [the seller] was the owner of the presses and was entitled to their immediate possession . . . [and that] [n]either [the buyer nor the seller] had any reason to believe that [a third party] would subsequently turn an about-face and assert a possessory interest in the presses.

*Id.* at 441.

In sum, *Litman*, *Specialty Tires of America*, and the Second Restatement reinforce our impression that impracticability under Pennsylvania law is only appropriate in cases dealing with the "occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." *9795 Perry Hwy. Mgmt.*, 273 A.3d at 1104 (quoting the Restatement (Second) of Contracts § 261). Because neither party here argued that a supervening event rendered their ability to

---

until January of 1975 when the gas company reached its peak capacity. *Id*.; *see also Kasemer v. Nat'l Fuel Gas Distrib. Corp.*, 421 A.2d 226, 227 (Pa. Super. Ct. 1980) (describing how a similar order issued to another gas company on February 1, 1972, did not become effective until April 1, 1974, when that gas company reached its peak capacity); *Leveto v. Nat'l Fuel Gas Distrib. Corp.*, 366 A.2d 270, 272 (Pa Super. Ct. 1976) (same).

perform impracticable, we hold that the District Court erred in applying the doctrine of impracticability.

* * *

For the reasons stated above, we will vacate and remand for further proceedings.